1

2          HONORABLE RICHARD A. JONES
           HONORABLE THERESA L. FRICKE
3

4

5

6

7                   UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
8                             AT SEATTLE

9   DANA MCARTHUR, as Personal
    Representative of the ESTATES of
10  ANDREA MCARTHUR and RACHEL          No. 2:22-cv-01071-RAJ-TLF
    MCARTHUR, and as ANDREA
11  MCARTHUR and RACHEL                 HOLLAND AMERICA
    MCARTHUR's Wrongful Death           DEFENDANTS' RULE 12(b)(6)
12  Beneficiary; COLLIN KOMPLIN,        MOTION TO DISMISS SECOND AM.
    as Personal Representative of the ESTATE  COMPLAINT
13  of JACQUELYN KOMPLIN, and ERIN
    KOMPLIN and COLLIN KOMPLIN as
14  JACQUELYN KOMPLIN's Wrongful Death   Noted for Consideration:
15  Beneficiaries; GERALD L. FULLER,    November 4, 2022
    as Personal Representative of the Estate of
16  JANET G. KROLL, and GERALD L. FULLER
    and WENDY CAVALLI, as Janet G. Kroll's
17  Wrongful Death Beneficiaries,

18
                    Plaintiffs,
19
          v.
20
    HOLLAND AMERICA LINE, INC.;
21  HOLLAND AMERICA LINE N.V., LLC,
    doing business as HOLLAND AMERICA
22  LINE N.V.; HAL ANTILLEN N.V.;
    SOUTHEAST AVIATION, LLC; and ROLF
23  W. LANZENDORFER, II, deceased, by and
    through  LORETTA A. LANZENDORFER Personal
24  Representative of the ESTATE of ROLF
    LANZENDORFER,
25
26
                    Defendants.
27

28  HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS        STOKES LAWRENCE, P.S.
    SECOND AM. COMPLAINT                                        1420 FIFTH AVENUE, SUITE 300
                                                                SEATTLE, WASHINGTON 98101-2393
                                                                (206) 626-6000

## I.      RELIEF REQUESTED

Plaintiffs' claims against Holland America Line, Inc.; Holland America Line N.V., LLC; and HAL Antillen N.V. (collectively, "the Holland America Defendants" or "HAL"), require an unprecedented expansion of maritime law and rely on conclusory allegations of vicarious liability. But neither Plaintiffs' implicitly proposed expansion of cruise-line liability nor their conclusory assertions of vicarious liability support a viable claim. The Holland America Defendants, therefore, respectfully request that the Court dismiss all claims against them under Rule 12(b)(6).

## II.      SUMMARY OF ARGUMENT IN SUPPORT

The facts in this case are undeniably tragic. Plaintiffs are the personal representatives for the estates of four individuals who died when a floatplane crashed near the Misty Fjords National Monument ("MFNM") in Alaska during a flight-seeing tour on August 5, 2021. The flight was operated by Defendant Southeast Aviation, LLC ("Southeast"), which owned the floatplane and employed the pilot, Rolf Lanzendorfer, who also died in the accident. According to Plaintiffs' Second Amended Complaint ("SAC"), the crash occurred because Mr. Lanzendorfer, whose estate is also a Defendant, negligently operated the flight despite adverse weather conditions.

On the day of the accident, Plaintiffs disembarked the *MS Nieuw Amsterdam* during the ship's call at Ketchikan. Plaintiffs did not book their floatplane tour through HAL, and HAL did not offer an excursion with or otherwise promote Southeast or the Southeast flight-seeing tour. Notwithstanding these concessions, Plaintiffs seek to hold HAL directly liable for maritime negligence and vicariously liable for Southeast's negligence in employing Mr. Lanzendorfer and for Mr. Lanzendorfer's negligence in deciding to pilot the aircraft despite adverse weather conditions. Both claims against HAL should be dismissed for failure to state a claim.

Plaintiffs' maritime negligence claim fails because the facts, as alleged, do not support imposing a duty of care on HAL to warn about a flight-seeing tour that HAL did not own, operate, or even sell tickets for, and that passengers booked entirely on their own. Long-established principles of maritime law hold that cruise lines are not insurers of their passengers and only have a duty to warn if they have actual or constructive knowledge of a *specific* risk-creating condition.

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1   *See Archer v. Carnival Corp. & PLC*, 2020 WL 7314847, at \*8 (C.D. Cal. Nov. 25, 2020). But

2   Plaintiffs do not allege that HAL knew or should have known about any particular risk associated

3   with Southeast. Instead, Plaintiffs maintain HAL had a duty to warn because it knew or should

4   have known that floatplane tours in the MFNM are *categorically unsafe* due to variable weather

5   conditions and the nature of the terrain.

6     Manifold pleading deficiencies require dismissal of the claims against HAL, not the least

7   of which is that maritime law only imposes on shipowners a duty to warn based on knowledge of

8   *specific* risks. This is why shipowners may have a duty to warn about known risks associated with

9   specific tour operators they promote and sell to their cruise passengers, but have no duty to warn

10   about general risks, like the risk of communicable diseases from outbreaks that occur on *different*

11   vessels. And this also explains why cruise lines have never been required to warn about excursions

12   passengers book independently and outside of a cruise line's shore-excursion program. Extending

13   maritime law to encompass Plaintiffs' claims would convert cruise lines into insurers and require

14   an almost limitless set of warnings.

15     In any event, Plaintiffs' maritime negligence theory fails on its own terms because nothing

16   in the SAC demonstrates that HAL knew or should have known that floatplane tours in the MFNM

17   are categorically unsafe or that floatplane tours specifically operated by Southeast were unsafe.

18   Nor is there any duty to warn that planes sometimes crash; that risk is open and obvious and

19   requires no warning as a matter of law.

20     Plaintiffs' claim alleging HAL should be vicariously liable for Southeast's and Mr.

21   Lanzendorfer's conduct fails for a more basic reason—Plaintiffs rely entirely on conclusory

22   recitations of the elements of a joint venture, partnership, or agency without pleading any facts

23   required to make any such claim plausible. Under virtually identical circumstances, federal courts

24   dismiss similarly conclusory efforts to impose vicarious liability. Plaintiffs' efforts should be

25   treated the same.

26

27

28   HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1
2

### III.    RELEVANT BACKGROUND

**A.    Plaintiffs' Allegations**

3      Plaintiffs are the estates of four individuals who perished on August 5, 2021, when a
4    floatplane owned and operated by Defendant Southeast crashed on a flight-seeing tour of the
5    MFNM near Ketchikan. Dkt. #35 at 2, 15 (SAC ¶¶ 1, 33). According to Plaintiffs, Southeast's
6    pilot, Mr. Lanzendorfer, opted to proceed with the flight despite "deteriorating and poor weather
7    conditions," *id*. at 18 (¶ 45), and "as a result … pilot Lanzendorfer crashed the floatplane into steep
8    and rocky terrain." *Id*. Plaintiffs allege that "the low cloud overcast, and limited visibility caused
9    the mountaintops to be obscured, thus increasing the likelihood that the subject sightseeing
10   floatplane excursion would end in a fatal aviation crash." *Id*. (¶ 48).

11     At the time of the accident, Plaintiffs[1] were all passengers on HAL's *MS Nieuw*
12   *Amsterdam*, which called into Ketchikan for one day of a seven day Alaska Explorer Cruise. *Id*. at
13   17 (¶¶ 40, 41). HAL offers cruise passengers, like Plaintiffs, numerous excursions operated by
14   third parties that passengers can book directly through HAL's shore-excursion program. *Id*. at 2
15   (¶ 2). Plaintiffs allege that HAL generally promoted and advertised floatplane excursions to
16   MFNM but they do not allege that HAL passengers could book excursions with Southeast. *Id*. at
17   4 (¶ 5). Plaintiffs do allege that HAL offered passengers on the *MS Nieuw Amsterdam* the ability
18   to book a floatplane excursion to MFNM through a different floatplane company via HAL's shore-
19   excursion program. *Id*.

20     None of the Plaintiffs booked their Southeast floatplane tour through HAL; rather, they all
21   booked through travel agents. *Id*. at 14-17 (¶¶ 33(a)-(c), 39). Plaintiffs allege that, "[u]pon
22   information and belief," after Plaintiffs booked their cruise, HAL sent "promotional material,
23   which provided information and descriptions of various shore excursions, including excursions
24   entitled, 'Misty Fjords & Wilderness Explorer Cruise' and 'Misty Fjords National Monument By
25   Seaplane.'" *Id*. at 16 (¶ 35). Plaintiffs also allege that HAL "marketed and promoted on its website

26

---

27   [1] Plaintiffs are the representatives of the estates for four of the individuals who were passengers on the floatplane trip
     and are deceased. For ease of reference, HAL's references to "Plaintiffs" encompasses the decedents themselves.

28   HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
     SECOND AM. COMPLAINT

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1  a substantially similar shore excursion entitled, 'The Misty Fjords National Monument by
2  Seaplane" that "took place in or about Ketchikan, Alaska." *Id*. (¶ 38). Plaintiffs further allege
3  "[u]pon information and belief" that they "browsed Holland's website in search of shore
4  excursions for each port of call" and that they "directed travel agents to purchase tickets for the
5  subject floatplane excursion" "after reviewing Holland's information concerning the 'Misty Fjords
6  National Monument By Seaplane.'" *Id*. at 16–17 (¶¶ 37–39). Plaintiffs allege that "[t]he most
7  popular ways to visit Misty Fjords National Monument are by air and sea." *Id*. at 18 (¶ 49).

8      On August 5, the *MS Nieuw Amsterdam* arrived in Ketchikan at 7:00 a.m. and was
9  scheduled to depart at 4 p.m., leaving passengers with eight hours "to disembark, participate in
10  any shore activities, and reboard the MS Nieuw Amsterdam." *Id*. at 17 (¶ 41). Plaintiffs' floatplane
11  tour with Southeast was scheduled for ninety minutes and departed from Ketchikan at 10:00 a.m.
12  *Id*. at 17, 19 (¶¶ 40, 52). According to the Preliminary Report from the National Transportation
13  Safety Board (NTSB), the accident involved "a controlled flight into terrain in poor visibility
14  conditions." *Id*. at 19 (¶ 51). Plaintiffs' flight traveled through the MFNM, landed at a look-out for
15  approximately 10 minutes, and then departed at 10:27 a.m. for its return to Ketchikan Harbor. *Id*.
16  (¶ 53). At 10:50 a.m., the aircraft sent an emergency locator signal but never returned to Ketchikan
17  and rescue crews discovered the wreckage in steep terrain at approximately 1750 feet. *Id*. at 19-20
18  (¶ 53, 54). The NTSB's Preliminary Report notes that other pilots reported "low clouds in the
19  valley in which the accident occurred." *Id*. at 20 (¶ 55).

20      According to the SAC, the Southeast pilot, Mr. Lanzendorfer, was involved in another
21  floatplane accident on July 9, 2021. *Id*. at (¶ 57). The NTSB's Preliminary Report says Mr.
22  Lanzendorfer struck a 1500-pound buoy because he "was in a hurry to get back" due to "more
23  flights on the schedule." *Id*. at 20 (¶ 57). Plaintiffs assert Mr. Lanzendorfer resumed flying for
24  Southeast "despite receiving no additional training" after the buoy incident *Id*. at 21 (¶ 60). The
25  accident that is the subject of this lawsuit occurred six days after Mr. Lanzendorfer resumed flying.
26  *Id*. ¶ 61. Plaintiffs allege in conclusory fashion that HAL knew or should have known that Mr.

28  HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1    Lanzendorfer was involved in this prior buoy incident, but the SAC is devoid of any factual

2    allegations regarding whether, how, or when HAL learned of the buoy incident. *Id*. at 23 (¶ 70).

3          Plaintiffs do not allege that HAL had any specific knowledge about dangers associated

4    with Southeast or Southeast's pilot, or that HAL sold tours for or promoted Southeast to its

5    passengers. Plaintiffs instead allege generally that all floatplane tours in the Ketchikan area are not

6    reasonably safe due to poor weather conditions (*e.g.* HAL "knew or should have been on notice

7    that the subject floatplane excursion under certain poor weather conditions was not reasonably safe

8    for its passengers") and that HAL had "actual and constructive knowledge of the grave safety

9    concerns regarding sightseeing floatplane excursions in the Ketchikan area." *Id*. at 21 (¶¶ 63, 64).

10   This knowledge allegedly is based on floatplane crashes near Ketchikan operated in "deteriorating

11   weather conditions" in July and August 2007 and in 2013 that resulted in fatalities of cruise

12   passengers, as well as a mid-air collision in 2019. *Id*. at 22–23 (¶¶ 66-67, 69). Plaintiffs, however,

13   allege no facts to show that HAL had actual or constructive notice of these prior accidents or that

14   the prior accidents had any bearing on the subject floatplane accident.

15         Plaintiffs additionally point to a 2015 floatplane accident involving the deaths of eight

16   passengers from a Holland America cruise that occurred "due to the pilot flying in hazardous

17   weather conditions." *Id*. at 22-23 (¶ 68). According to Plaintiffs, the NTSB issued a report on the

18   2015 accident, "NTSB/AAR-17/02," in 2017 and noted the "[n]eed for cruise industry awareness

19   of schedule pressures associated with air tours sold as shore excursions" and that "[t]he cruise

20   industry may not be aware that air tour operators that fly tours as cruise line shore excursions may

21   face schedule pressures to return passengers to the ship on time." *Id*. Plaintiffs also allege that the

22   NTSB recommended that the Cruise Lines International Association, of which HAL is a member,

23   "[e]ncourage your members that sell air tours as shore excursions to review the circumstances of

24   this accident and to consider ways to mitigate associated risks. (A-17-44)." *Id*.

25         Plaintiffs do not include any of the NTSB's other findings in the SAC, which provides

26   critical context for its statements on scheduling issues and subsequent letter to CLIA. Specifically,

27   unlike here, the NTSB found that the passengers in the 2015 accident booked their excursion

28   HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
     SECOND AM. COMPLAINT

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

directly through the cruise line and that one benefit for the passengers is that, if the excursion runs late and passengers miss the all aboard time, the cruise line will pay the costs associated with housing the passengers and transporting them to the vessel's next port of call. *See* Declaration of Caryn Geraghty Jorgensen, Ex. A ("2017 NTSB Report") at 63 (¶ 2.5); Ex. B ("NTSB Letter") at 2. The NTSB also explained that the cruise line "passed the risk of these expenses on to the air tour operators . . . as the cruise line specified that any tour operator that failed to return guests in time for a ship's departure was responsible for covering the expenses associated with accommodations and travel to deliver those passengers to the ship's next port." *Id.* Ex. A at 63 (¶ 2.5). According to the NTSB, the passengers on the 2015 accident flight had an "all aboard" at 12:30 p.m. and the flight departed at 12:07, which was later than planned. *Id.*

On the return leg of the 2015 flight, when the accident occurred, the pilot had two routes available: "the shorter, overland route (which takes about 25 minutes to complete) and longer, overwater route (which takes about 30 minutes to complete)." *Id.*; *see also id.* at 53 (¶ 2.3.1) (noting that accident tour departed late and that floatplane operator's president "reminded the pilots to be mindful of the cruise ship boarding time"). The NTSB found in the 2015 accident that "the pilot's decision to fly the riskier, overland route despite marginal weather conditions and the availability of a safer, overwater route was influenced, in part, by schedule pressure." *Id.* at 54 (¶ 2.3.1). Plaintiffs here do not allege that Mr. Lanzendorfer opted to fly on a less safe but faster route due to concerns about returning to Ketchikan to ensure that they did not miss their "all aboard" time. Nor do they allege that Southeast would have to pay to transport Plaintiffs to the next port.

**B.    Plaintiffs' Claims in the SAC**

Plaintiffs' Second Amended Complaint asserts two causes of action against the Holland America Defendants: maritime negligence based on an alleged failure to warn and vicarious liability. Plaintiffs also allege vicarious liability against Southeast and Mr. Lanzendorfer; and negligence against Mr. Lanzendorfer.

Plaintiffs' maritime negligence claim against HAL alleges that, by virtue of prior floatplane accidents occurring near Ketchikan over the last 15 years, HAL "had actual knowledge, or at the

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS SECOND AM. COMPLAINT

1    very least constructive knowledge, of the dangers associated with floatplane shore excursions to
2    the Misty Fjords Monument." Dkt. #35 at 25 (SAC ¶ 78). According to Plaintiffs, this "knowledge"
3    created a duty to warn HAL's passengers about participating in "sightseeing floatplane shore
4    excursions at/or near the Ketchikan and Misty Fjords National Monument area" due to "the
5    unreasonably dangerous conditions caused by the mountainous terrain coupled with unsafe
6    weather condition, including the low cloudy overcast and poor 2-3 mile visibility and high aviation
7    traffic." *Id*. at 25–26 (¶ 80). Plaintiffs further maintain that HAL had a duty to warn about these
8    "dangers" even though it "did not directly sell the subject floatplane excursion" because it "knew
9    their passengers would participate in seaplane excursions purportedly operated and sold by third
10   parties and encouraged them to do so." *Id*. at 26 (¶ 81).

11          Plaintiffs' second cause of action pleads that HAL is vicariously liable on the alleged basis
12   that it engaged with Southeast "in a joint venture, agency relationship, and/or partnership to
13   provide excursions to passengers aboard the Holland Defendants' ships." *Id*. at 27 (¶ 87). Plaintiffs
14   allege in conclusory fashion the legal elements of a joint venture or partnership, including "upon
15   information and belief," that the parties "had an express or implied contract to work together for
16   their mutual profit, with a mutual sharing of the risks, benefits, and control of that endeavor,"
17   making them "partners and joint venturers." *Id*. at 27–28 (¶ 89); *see also id*. at 29–20 (¶ 96).

18          The SAC, however, is devoid of factual allegations about the purported contract, profit
19   sharing, or how the parties jointly controlled the endeavor. Indeed, the only non-conclusory facts
20   Plaintiffs allege are that HAL required Southeast to name it as an additional insured, *id*. at 4, 25
21   (¶¶ 6, 77), but they do not allege any facts to establish what the insurance was for or that it was
22   part of an agreement between the parties to operate flightseeing tours. Plaintiffs also allege that
23   HAL "made its cruise schedule and itinerary available to Defendant Southeast," *id*. at 28 (¶ 93),
24   but they do not allege how this occurs, if the information is any different than the information
25   freely available on HAL's website, or, given that Plaintiffs' SAC acknowledges that HAL did not
26   sell the subject floatplane tour or indeed any Southeast tours, *id*. at 26 (¶ 81), if it is associated
27   with any specific contract.

28   HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
     SECOND AM. COMPLAINT

Plaintiffs allege "in the alternative" that "if the Holland Defendants did not directly profit from the sale of shore excursions operated by Defendant Southeast, Defendant Southeast was an agent or ostensible agent of the Holland Defendants." *Id*. at 29 (¶ 95). Confusingly, Plaintiffs also allege that Southeast and HAL "were the agents, ostensible agents, servants, partners, and/or joint venturers of each of the other Defendants, and each was at all relevant times acting on behalf of and in concern with the others." *Id*. at 31 (¶ 103). In other words, Plaintiffs allege both that Southeast was the agent of HAL *and* that HAL was the agent of both Southeast and Mr. Lanzendorfer. Yet, the conclusory allegations of "agency" are paired with no alleged facts in support.

Finally, Plaintiffs allege that Mr. Lanzendorfer was negligent and breached duties of care by departing for the excursion "in visibility conditions less than two and one-half miles (2.5 mi) and precipitation" and for "[f]ailing to cancel the Subject Floatplane Excursion due to deteriorating weather conditions." *Id*. at 32–33 (¶ 111(b), (c)); *see id*. at 34 (¶ 119(b)(c)) (same). Plaintiffs further allege that Mr. Lanzendorfer's negligence is "imputed by law to Defendant Southeast Aviation." *Id*. at 34 (¶ 120). Plaintiffs do not allege that HAL itself played any role in Mr. Lanzendorfer's decision to fly on August 5.

## IV.    LEGAL AUTHORITIES AND ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 67)). "Plausibility requires pleading facts, as opposed to conclusory allegations or the 'formulaic recitation of the elements of a cause of action,' *Twombly*, 550 U.S. at 555, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief," *id*. (citing *Iqbal*, 556 U.S. at 678-79).

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

To state a claim for relief, it is not enough for the plaintiff to "plead[] facts that are merely consistent with a defendant's liability"; such a claim "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. While allegations of material fact are taken as true, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Turner v. City & Cnty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (internal quotation marks omitted). Pleadings that are no more than legal conclusions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664; *see also Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).

Neither of the two causes of action Plaintiffs assert against HAL—maritime negligence and vicarious liability—present a viable claim for relief. First, Plaintiffs fail to state a maritime negligence claim because they cannot allege facts sufficient to support a reasonable inference that HAL breached a duty of care owed to them. Second, Plaintiffs fail to state a claim based on vicarious liability because they do not allege facts to establish any of the elements required to reasonably infer that HAL and Southeast were joint ventures, partners, or agents of each other.

## A.   Plaintiffs' Maritime Negligence Claim Fails and Should Be Dismissed

Plaintiffs' maritime negligence claim rests on an unprecedented effort to expand maritime law to make cruise ship owners and operators guarantors for the safety of passengers on sightseeing tours passengers book on their own and that cruise lines do not own, operate, or sell. Existing maritime law forecloses this proposed expansion of liability because it would be contrary to long-established principles governing duties owed to cruise passengers. Confronted with this reality, Plaintiffs plead that a 2017 NTSB Report and NTSB Letter put HAL on actual or constructive notice about the dangers cruise passengers might encounter on floatplane tours in the MFNM. Not only is such "notice" insufficient to create a duty, the inference that the 2017 NTSB Report and NTSB Letter provided such notice is unsupported by the very report Plaintiffs incorporate into the SAC. Because the only remaining danger that existed was the "obvious" risk that planes sometimes crash, HAL owed no duty to warn. Plaintiffs' maritime negligence claim necessarily fails.

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

### 1. Plaintiffs Must Allege that HAL had Actual or Constructive Notice of the Specific Risk-Creating Condition

The elements of a maritime negligence claim include (1) a duty of care, (2) breach of the duty, (3) causation, and (4) damages. *See Saltzstine v. Princess Cruise Lines Ltd.*, 2020 WL 8475998, at*2 (C.D. Cal. Oct. 23, 2020). Federal law recognizes an essential limitation on maritime negligence: a cruise line "does not serve as an insurer to its passengers." *Archer*, 2020 WL 7314847, at *8 (quotation marks omitted); *see also Saltzstine*, 2020 WL 8475998, at *2. Nor can a cruise line be liable for the mere failure to *foresee* harm. *Weiner v. Carnival Cruise Lines*, 2012 WL 5199604, at *2 (S.D. Fla. Oct. 22, 2012). Rather, "a carrier must have '*actual or constructive notice of the risk-creating condition*' before it can be held liable." *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011) (emphasis added) (quoting *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). Thus, a cruise line "must warn passengers only of those dangers that 'the cruise line knows or reasonably should have known,' and 'which are not apparent and obvious to the passenger.'" *Archer*, 2020 WL 7314847, at *8 (quoting *Weiner*, 2012 WL 5199604, at *2).

Knowledge—actual or constructive—must be pleaded and proven at a specific level. Awareness of a *category* of harms that could injure passengers is insufficient. *Samuels*, 656 F.3d at 953-54. The cruise line must have reason to know that the particular hazard was present where the injury occurred. *Id.* In *Archer* and several other cases, for example, federal courts repeatedly rejected claims that cruise lines owed any duty to warn about the possible dangers of passengers contracting COVID-19 on a vessel unless they had actual or constructive knowledge that the disease was present on the plaintiffs' vessel. 2020 WL 7314847, at *8; *see also Saltzstine*, 2020 WL 8475998, at*2. A duty to warn did not arise merely because cruise lines knew about the presence of COVID-19 in other parts of the world or even on other vessels they operated. *Id.* at *3 ("The fact that a *different* ship, in another country, had experienced an outbreak could not have indicated to Defendant the need to implement more stringent safety protocols on the *Grand Princess*."); *see also Dorety v. Princess Cruise Lines Ltd.*, 2021 WL 4913508, at *4 (C.D. Cal.

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

Oct. 1, 2021) (stating the question as whether "Princess Cruises knew or should have known that the SARS-CoV-2 virus was present on the *Grand Princess* at the time of [plaintiffs'] cruise" and rejecting as inadequate evidence about the virus on different vessels or general knowledge about virus).

These cases accord with an unbroken line of maritime precedent holding that knowledge must be specific to the risk, the time period, and the location of injury. The Ninth Circuit held, for example, that a shipowner without knowledge of dangers at a particular plaza where a passenger fell on uneven pavement cannot be liable for the fall, even if it knows about the risks of unstable pavement generally or even in the region. *Reming v. Holland Am. Line Inc.*, 662 F. App'x 507, 509-10 (9th Cir. 2016). Similarly, shipowners without specific knowledge of the danger that someone would trip over a screw on a particular stairway on board the ship cannot be liable for a passenger tripping and falling, even if they know that screws sticking up on a stairway, *if* present, could create a risk of tripping. *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 64-65 (2d Cir. 1988). And shipowners cannot be liable if they lack knowledge of adverse weather near a ship's location at the time of an accident, *Kressly v. Oceania Cruises*, 718 F. App'x 870, 872 (11th Cir. 2017); or lack knowledge of a slipping hazard at the particular location where a passenger fell, *Francis v. MSC Cruises, S.A.*, 835 F. App'x 512, 516-17 (11th Cir. 2020) (affirming summary judgment because evidence did not show notice of the specific piece of watermelon on the ground where plaintiff failed to establish "notice of *the* piece of watermelon that caused her to fall").

Even when cruise lines sell tickets for shore excursions through their own shore excursion programs, courts reject any duty to warn unless the cruise line has actual or constructive notice of dangers associated with a particular operator, such as prior safety incidents or complaints from passengers about a specific operator. *See, e.g.*, *Wolf v. Celebrity Cruises, Inc.*, 683 Fed. Appx. 786, 794 (11th Cir. 2017) (finding that cruise line had no duty to warn about specific zip-line operator because the cruise line "received no incident reports … or passenger safety concerns" about the operator). Courts recognize that, even for cruise-line-sold tours, to impose a duty in the absence of

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1   actual or constructive notice about dangers associated with the specific excursion operator "would

2   be akin to imposing vicarious strict liability upon [the cruise line]." *Id.* at 795.

3          Plaintiffs' maritime negligence claim flies in the face of these principles. Plaintiffs rely on

4   a theory that HAL had a duty to warn because it knew or should have known that MFNM floatplane

5   tours are categorically unsafe because some prior flight tours crashed there and resulted in

6   fatalities. Dkt. #35 at 4 (SAC ¶ 5). Even if HAL had knowledge of this category of risk, the danger

7   is not specific to Southeast and therefore could not give rise to a duty to warn. *Cf. Wolf*, 683 F.

8   App'x at 794–95. Significantly, however, Plaintiffs do not even attempt to allege that HAL had

9   knowledge of the *specific* risk-creating condition; namely, the dangers associated with passengers

10  booking MFNM floatplane excursions with Southeast. Indeed, Plaintiffs never allege facts to show

11  that HAL knew or should have known about *any dangers associated with Southeast*, including that

12  it would negligently operate in adverse weather conditions, and Plaintiffs admit they booked their

13  excursions through travel agents, not HAL. Dkt. #35 at 14–15 (SAC ¶ 33(a)–(c)).

14         Triggering duties to warn of risk-creating conditions at such a high level of generality, as

15  Plaintiffs propose, would convert cruise lines into insurers for their passengers and make them

16  potentially liable for any injury passengers sustain every time they step foot off the vessel *even if*

17  *the cruise line never has knowledge about a specific danger*. *See, e.g.*, *Wolf*, 683 F. App'x at 794–

18  95. The cases involving injuries to passengers stemming from excursions sold by a cruise line

19  amplify the shortcomings of Plaintiffs' claim. Those cases all involve situations where passengers

20  book shore excursions *through the cruise line itself*. Even then, when the cruise line and the tour

21  operator have a contractual relationship, establishing that the cruise line had the requisite specific

22  knowledge of a specific danger is a high burden. *Compare Ceithaml v. Celebrity Cruises, Inc.*, 257

23  F. Supp. 3d 1326, 1339 (S.D. Fla. 2017) (granting summary judgment for cruise in relation to

24  injury sustained in zipline excursion purchased through cruise where cruise "had no notice of

25  issues with the safety of [operator's] zip-line") *with Chimene v. Royal Caribbean Cruises, Ltd.*,

26  16-23775-CV, 2017 WL 8794706, at *5–6 (S.D. Fla. Nov. 14, 2017) (denying summary judgment

27

28  HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
    SECOND AM. COMPLAINT

for cruise line for injury sustained in zipline excursion booked through cruise where there were numerous prior incidents and complaints "about this operation").

These cases are consistent with maritime law principles because they are based on a cruise line's knowledge about the dangers of a particular excursion operator. HAL is aware of no cases extending a duty to warn about an entire category of activities in a port of call, especially when passengers book a tour on their own and the cruise line neither advertises nor promotes the tour operator.

Unable to point to any knowledge specific to Southeast, Plaintiffs instead posit that it was "foreseeable" to HAL that passengers would go on flightseeing tours with Southeast. Dkt. #35 at 35 (SAC ¶ 75). But foreseeability in the absence of actual or constructive knowledge of the specific risk creating condition is not sufficient to state a maritime claim. *Weiner*, 2012 WL 5199604, at *2.

Moreover, the implications of imposing a duty to warn under these circumstances are especially stark considering the reality of Plaintiffs' chosen activity: aviation is a highly regulated industry, as the Federal Aviation Administration closely regulates certificated operators, like Southeast, and certificated pilots, like Mr. Lanzendorfer, for flights in United States airspace.

Even after investigating the 2015 floatplane accident, the NTSB made no safety recommendations to restrict or close the MFNM airspace and the FAA continued to allow flightseeing tours through the MFNM without requiring that any warnings be given to potential passengers about any allegedly unreasonable risks associated with such flights. *See* Jorgensen Decl. Ex. A at 69–70 (2017 NTSB Report ¶¶ 4.1-4.2). Plaintiffs' claim, therefore, presupposes that HAL knew more (and better) than the NTSB and FAA, and more than FAA-certificated Part 135 operators and pilots, about whether and how aircraft should operate at any given time in the MFNM. This outcome defies both common sense and principles of federal preemption.

> **2.    Plaintiffs fail to allege facts to reasonably infer that HAL had actual or constructive knowledge about a specific risk associated with floatplane flights at Misty Fjords on the day of the accident.**

Even if Plaintiffs could state a maritime negligence claim premised on a duty to warn about floatplane flights in the MFNM, their own allegations and material incorporated by reference into

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1   the SAC reveal the inadequacy of their allegations to state a claim based on the proposition that

2   HAL had knowledge of this risk-creating condition.

3        Start with Plaintiffs theory: HAL allegedly failed to warn Plaintiffs about the dangers of

4   participating in a floatplane excursion in the MFNM despite actual knowledge of the risks noted

5   in the 2017 NTSB Report regarding a 2015 floatplane accident. Dkt. #35 at 3–4, 22–23, 25

6   (SAC ¶¶ 3–6, 68, 78-79). Plaintiffs maintain that the "NTSB attributed the crash to scheduling

7   pressures that force some seaplane operators to fly in marginal conditions" and "concluded that

8   the cruise industry 'may not be aware that the cruise line's schedule may contribute to the

9   scheduling pressures air tour operators face associated with returning shore excursion passengers

10  to their ship in time.'" *Id*. at 3 (¶ 4). Plaintiffs further allege that the NTSB submitted a letter to

11  CLIA, of which HAL is a member, encouraging cruise lines that sell air tours as shore excursions

12  that they should "review the circumstances of the fatal 2015 floatplane accident in the Misty Fjords

13  National Monument/Ketchikan to consider ways to mitigate associated risks." *Id*. (¶ 4). Plaintiffs

14  thus allege that HAL actually knew about the dangers of floatplane excursions in Misty Fjords and

15  that "the scheduling pressures exerted by the cruise industry exacerbated the risks associated with

16  the already dangerous flying conditions associated with the Misty Fjords." *Id*. at 25 (¶ 79).

17       When evaluating the sufficiency of Plaintiffs' claim, the incorporation by reference

18  doctrine requires the Court to consider the 2017 NTSB Report and Letter themselves.[2] Contrary

19  to Plaintiffs' assertions, nothing in the 2017 NTSB Report and Letter warn about a general danger

20  associated with all floatplane tours in Misty Fjords or suggests some general risk for floatplane

21  tours sold independently of the cruise lines due to cruise line "scheduling." Quite the contrary.

22

23  [2] The Ninth Circuit extends this doctrine "to situations in which the plaintiff's claim depends on the contents of a
24  document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity
    of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."
    *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see also Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006).
25  Plaintiffs' maritime negligence claim depends on the contents of the 2017 NTSB Report and Letter as they are the
    basis for their allegation that HAL had knowledge of the risk-creating condition. *See* Dkt. #35 at 3–4, 22–23, 25 (SAC
26  ¶¶ 3-6, 68, 78-79). Because HAL has attached authentic copies of the 2017 NTSB Report and Letter to this motion,
    the incorporation-by-reference doctrine applies here and the "[t]he court may treat such a document as 'part of the
27  complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'"
    *Marder*, 450 F.3d at 448.

28  HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
    SECOND AM. COMPLAINT

1    The 2017 NTSB Report addressed a specific "scheduling" issue that arose when "a ship
2  sailed without guests who were delayed due to a late arriving tour" and "the tour operator would
3  be responsible for the accommodations and travel expenses associated with delivering those
4  passengers to the ship's next port of call." Jorgensen Decl. Ex. A (2017 NTSB Report) at 36
5  (¶ 1.9.1); *id*. at 53 (¶ 2.3.1) (noting incentive for cruise-line-sold tour operators to return guests on
6  time because "tour operators that failed to return passengers in time for a ship's departure were
7  responsible for the accommodations and travel expenses associated with delivering those
8  passengers to the ship's next port of call"). As the NTSB explained, this arrangement was "one
9  benefit of purchasing a shore excursion through the cruise line (rather than from the air tour
10 operators directly)" since it meant that "the cruise ship guests incur no expenses if a late-returning
11 excursion delays the ship's departure (or causes the guests to miss its departure). *Id*.; *see also id*.
12 at 63 (¶ 2.5).

13    The 2017 NTSB Report linked this specific arrangement to the 2015 accident. *See id*. at 45
14 (¶ 2.2); *id*. at 53 (¶ 2.3.1); *id*. at 63 (¶ 2.5). The NTSB explained that the 2015 accident flight
15 departed late, at 12:07 p.m., and the operator's president/CEO "had reminded the pilots to be
16 mindful of the cruise ship boarding time," which was 12:30 p.m. *Id*. at 63 (¶ 2.5). For the return
17 leg of the excursion, the pilot had two routes available: "the shorter, overland route (which takes
18 about 25 minutes to complete) and longer, overwater route (which takes about 30 minutes to
19 complete)." According to the NTSB, "the pilot's decision to fly the riskier, overland route despite
20 marginal weather conditions and the availability of a safer, overwater route was influenced, in part,
21 by schedule pressure." *Id*. at 54 (¶ 2.3.1). It was this finding, and the excursion operator's
22 agreement to pay to transport passengers who miss their "all aboard" to the next stop that NTSB
23 called out to CLIA recommending it discuss scheduling policies with its members. *Id*. at 63 (¶ 2.5).

24    On its face, the 2017 NTSB Report provides no notice to HAL of a risk-creating condition
25 because none of the risk factors it identified are alleged here. Plaintiffs did not book their floatplane
26 tour through HAL; they booked their tour through third-party travel agents. Dkt. #35 at 14–17
27 (SAC ¶¶ 33, 39). Plaintiffs do not allege Southeast had any sort of obligation to pay the expenses
28 HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
   SECOND AM. COMPLAINT

1    associated with bringing passengers to the cruise's next stop if their flights ran late and passengers

2    missed the ship's departure time. Plaintiffs do not allege that Mr. Lanzendorfer opted to fly a

3    shorter, more dangerous route due to concerns about missing the Plaintiffs' "all aboard" and having

4    to incur expenses to bring them to the next port of call. And, finally, Plaintiffs do not allege that

5    their tour faced *any* time pressures whatsoever—Plaintiffs tour left at 10:00 a.m., was scheduled

6    for 90 minutes, and their "all aboard" was not until 4 p.m. *Id*. at 17, 19 (¶¶ 40, 41, 52).

7    　　　The 2017 NTSB Report (and 2015 accident) could not have provided HAL with actual or

8    constructive notice about a risk-creating condition pertinent to this case because none of the

9    circumstances the NTSB warned about are alleged here.

10   　　　**3.　　HAL had no duty to warn about obvious dangers**

11   　　　Because Plaintiffs cannot rely on the 2017 NTSB Report to allege HAL had actual or

12   constructive notice of any relevant dangers associated with MFNM floatplane tours, the only

13   remaining, theoretical basis for a duty to warn is knowledge of risks generally associated with

14   flying. But HAL had no duty to provide such a warning because "[c]ourts have consistently held

15   that there is no duty to warn of an obvious and apparent danger." *Samuels v. Holland Am. Line-*

16   *USA*, No. C09-1645, 2010 WL 3937470, at *2 (W.D. Wash. Oct. 4, 2010); *see also Brisk v. Crystal*

17   *Cruises*, LLC, No. 2:18-cv-00155, 2018 WL 11355157 (C.D. Cal. Nov. 8, 2018) (same). "'Open

18   and obvious conditions are those that should be obvious by the ordinary use of one's senses.'"

19   *Brisk*, 2018 WL 11355157, at *2 (quoting *O'Malley v. Royal Caribbean Cruises, Ltd.*, No. 17-

20   21225, 2018 WL 4323792, at *3 (S.D. Fla. Sept. 10, 2018)). Courts have thus held that there is no

21   duty to warn that the "dangers of wake jumping include the danger that the rider may fall off the

22   [personal water craft] while, during, or after jumping a wake or [] collide with another vessel,"

23   *Hodges v. Summer Fun Rentals, Inc*., 203 Fed. Appx. 89 (9th Cir. Oct. 12, 2006), or the risks of

24   stepping on a balloon while walking on a dance floor "visibly strewn with hundreds of balloons,"

25   *Brisk*, 2018 WL 11355157, at *3.

26   　　　Here, Plaintiffs cannot base a maritime negligence claim on an alleged failure by HAL to

27   warn that airplanes, including floatplanes operating in the MFNM, sometimes crash. As a matter

28   HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
     SECOND AM. COMPLAINT

of law, this danger is "open and obvious" and requires no warning. Indeed, even more so than the dangers in *Hodges* and *Brisk*, *everyone* knows that plane crashes are an unfortunate reality of aviation and the danger therefore is unquestionably "obvious by the ordinary use of one's senses." *Brisk*, 2018 WL 11355157, at *2. For this reason, Plaintiffs' conclusory references to four prior floatplane crashes in the MFNM occurring over the last 15 years are not notice of any relevant risk-creating condition. *See* Dkt. #35 at 22–23 (SAC ¶¶ 66–67, 69). Other than that the prior accidents involved aircraft operating in the vicinity of MFNM, Plaintiffs allege nothing about these accidents to show that they provided notice of anything other than the "obvious" fact that, tragically, planes crash. Even if Plaintiffs had alleged that these prior accidents provided notice of some relevant, non-obvious risk-creating condition, they never allege facts to show how HAL had actual or constructive notice such that it had a duty to warn.

Established principles of maritime law thus foreclose Plaintiffs' attempt to assert a maritime negligence claim against HAL.

## C.   Plaintiffs' Vicarious Liability Claim Against the Holland Defendants Fails

Plaintiffs not only fail to state a claim based on direct liability, their attempt to plead vicarious liability also falls short of stating a viable claim. For each of Plaintiffs' vicarious liability theories, Plaintiffs offer nothing more than a recitation of the requisite legal elements and the conclusory proposition that HAL and Southeast "engaged in a joint venture, agency relationship, and/or partnership." *Id*. at 27 (¶ 87).[3] Consequently, Plaintiffs' claims premised on vicarious liability must be dismissed.

---

[3] Plaintiffs do not plead a specific body of law that governs their vicarious liability claim but they do allege that their tickets with HAL state that "all claims and disputes … shall be governed by maritime law and further provide that if maritime law is not applicable, the laws of the State of Washington shall govern the contract." Dkt. #35 at 11–12 (SAC ¶ 23). Further, Plaintiffs allege that two of the HAL Defendants maintain their principal place of business in the State of Washington, *id*. at 6 (¶ 11), and that the third "do[es] business in conjunction with and in concert with [the first two HAL Defendants] in the State of Washington," *id*. at 7–8 (¶ 15). Therefore, for purposes of this motion to dismiss, HAL assumes that Washington substantive law governs Plaintiffs' vicarious liability claim against it.

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

1

2

      **1.**      **Plaintiffs fail to allege facts to establish that HAL and Southeast were joint venturers or partners.**

3

"The essential elements of a joint venture include: (1) an express or implied contract, (2) a

4

common purpose, (3) a community of interest, and (4) an equal right to control."

5

*O'Donnell/Salvatori, Inc. v. Microsoft Corp.*, C20-882-MLP, 2021 WL 535128, at \*3 (W.D.

6

Wash. Feb. 12, 2021) (collecting cases). Under Washington law, additional "indicia of a joint

7

venture include the right to share in profits, a duty to share in losses, and a joint proprietary interest

8

in the subject matter." *Adams v. Johnston*, 71 Wn. App. 599, 611, 860 P.2d 423 (1993) (internal

9

citations omitted). A joint venture is similar to a partnership but is limited to a particular transaction

10

or project. *Pietz v. Indermuehle*, 89 Wn. App. 503, 510, 949 P.2d 449 (1998), *as amended on

11

clarification* (Feb. 27, 1998).

12

Here, Plaintiffs' SAC offers nothing more than conclusory recitations of the elements of

13

the claim. *See, e.g.,* Dkt. #35 at 27–28 (SAC ¶ 89) ("Upon information and belief," "the Holland

14

Defendants and Defendant Southeast worked together to promote and provide the Misty Fjords

15

Flightseeing excursion to the Holland Defendants' cruise passengers" and that they "had an

16

express or implied contract to work together for their mutual profit, with a mutual sharing of the

risks, benefits, and control of that endeavor.").

17

Simply plugging the names of HAL and Southeast into the legal elements is insufficient to

18

state a claim. *See Iqbal*, 556 U.S. at 662; *Kwan*, 854 F.3d at 1096. Federal courts reject such

19

conclusory allegations devoid of any factual support.  *See, e.g.*, *Williams v. Yamaha Motor Co.*,

20

851 F.3d 1015, 1025 n.5 (9th Cir. 2017) (holding that allegation that "Defendants … were the

21

agents or employees of each other and were acting at all times within the course and scope of such

22

agency and employment" "is … a conclusory legal statement unsupported by any factual assertion

23

regarding YMC's control over YMUS"); *Aliign Activation Wear, LLC v. lululemon athletica inc.*,

24

2020 WL 5790418, at \*4 (C.D. Cal. Aug. 24, 2020) (allegation that company "has the right to

25

control the conduct of [the Canadian entity] with respect to the matters entrusted to it" is legal

26

conclusion and not entitled to credit).

27

28

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

**STOKES LAWRENCE, P.S.**
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1    Here too, Plaintiffs fail to allege facts to provide any of the details needed to plausibly

2    allege that HAL and Southeast formed a joint venture or partnership. For starters, Plaintiffs never

3    allege facts to show that HAL and Southeast had a contract to create a joint venture or partnership,

4    even though it is "'[t]he sine qua non of the relationship.'" *Perry v. HAL Antillen NV*, 2013 WL

5    2099499, at *25 (W.D. Wash. May 14, 2013) (quoting *Carboneau v. Peterson*, 1 Wn.2d 347, 95

6    P.2d 1043 (1939)). Plaintiffs instead offer the legal conclusion that HAL and Southeast had "an

7    express or implied contract," Dkt. #35 at 27–28 (SAC ¶ 89), but never allege supporting facts to

8    make such a claim plausible, like the contract's terms or its purpose.

9    Nor do Plaintiffs plead the existence of a contract by alleging that "[t]he Holland

10   Defendants and Southeast entered into an express or implied agreement that Defendant Southeast

11   would operate and shore excursions that were promoted, marketed, directed to the Holland

12   Defendants' cruise passengers on behalf of such joint venture." *Id*. at 29–30 (¶ 96(a)). Tellingly,

13   Plaintiffs do not allege that this agreement was an actual contract, as is necessary to form a joint

14   venture or partnership. *See Adams*, 71 Wn. App. at 611("Joint ventures are not created by operation

15   of law. They arise by express or implied contract."). This is not merely a semantic distinction since

16   there are all sorts of agreements that are not contracts; indeed, a contract is a binding agreement,

17   the breach of which permits a damages action. Alleging the existence of an agreement that is *not*

18   a contract is not enough to plead the existence of a joint venture or partnership.

19   Moreover, the few facts Plaintiffs do allege about the relationship between HAL and

20   Southeast show that any inference that they had such a contract would be unreasonable. By

21   Plaintiffs' own account, HAL promoted Misty Fjords floatplane excursions offered by Southeast's

22   competitors and sold tickets for competing tours directly through HAL. Dkt. #35 at 2–4 (SAC ¶¶ 2,

23   5). It makes no sense that HAL and Southeast would have had a contract to establish a joint venture

24   or partnership involving floatplane tours of the MFNM at the exact same time that HAL was

25   promoting and selling a competing floatplane excursion. At the very least, these admissions require

26   Plaintiffs to allege some facts that make the existence of a contract between HAL and Southeast

27   plausible. *Iqbal*, 556 U.S. at 678.

28   HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
     SECOND AM. COMPLAINT

The remaining facts Plaintiffs allege do not make the existence of a joint venture or partnership contract between HAL and Southeast plausible on its face. For example, Plaintiffs allege that HAL made its itinerary available to Southeast. Dkt. #35 at 28 (SAC ¶ 93). But Plaintiffs do not allege it was provided as part of any contractual arrangement, how HAL shares the information, or whether the information it shares is any different than the information freely and publicly available on HAL's website listing its cruise schedules. Indeed, Plaintiffs allege that HAL generally "advertise[s] and market[s] shore excursions in order to promote the overall cruise experience," *id*. at 2–3 (¶ 2), but not that HAL only provides its itinerary to Southeast as opposed to all operators as a way to foster the cruise experience. Plaintiffs also allege that Southeast named HAL as an additional insured, *id*. at 4 (¶ 5), but not that this was required by a term of some contract to establish a joint venture or partnership. To the contrary, Plaintiffs allege that HAL required Southeast to name it as an additional insured in response to the 2017 NTSB Report, suggesting it had nothing at all to do with any alleged contract. *Id*. ¶ 6.

Even if Plaintiffs had alleged sufficient facts to plead via reasonable inference that a contract existed, the SAC still fails to plausibly allege facts to establish that HAL and Southeast agreed to share profits and losses. "The absence of a mutual interest in profits 'has been held to be conclusive evidence that a joint venture does not exist.'" *Perry*, 2013 WL 2099499, at \*25 (citation omitted). Here, again, Plaintiffs' conclusory assertion that HAL and Southeast agreed to work together "for mutual profit" "merely parrot[s]" the legal elements and does not plausibly allege sharing of profits and losses. *See Fields v. Wise Media, LLC*, No. C 12-05160, 2013 WL 5340490, at \*4 (N.D. Cal. Sept. 24, 2013) (allegation "that 'all of the Merchant Defendants shared in the revenue generated from the Subscription Plans' … [is] merely parroting the second element of the joint venture theory without providing facts to support their wholly conclusory allegation"). What is more, Plaintiffs' allegation that HAL advertised a competitor's floatplane excursion strongly suggests HAL and Southeast never agreed to share profits and losses. After all, if HAL and Southeast agreed to share profits and losses, it would make no sense for HAL to promote and sell bookings for one of Southeast's competitors.

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

1    Finally, Plaintiffs do not allege facts that HAL and Southeast had "an equal right to control"

2    the purported joint venture or partnership. *See Paulson v. Pierce County*, 99 Wn.2d 645, 654, 664

3    P.2d 1202 (1983). Plaintiffs actually allege just the opposite, that "[t]he Holland Defendants

4    governed the subject of how, when and where the agreement to provide sightseeing floatplane

5    tours to their cruise passengers was to be performed." Dkt. #35 at 30 (SAC ¶ 96(f)). If HAL

6    "governed" how the tour was operated, as Plaintiffs allege, then Southeast could not have had "an

7    equal right to control," and they could not have formed a joint venture or partnership.

8    Plaintiffs' vicarious liability claim based on the joint venture or partnership theories fails

9    as a matter of law and should be dismissed.

10    **2.    Plaintiffs fail to allege facts sufficient to raise a reasonable inference that
            HAL and Southeast had an agency relationship.**

11

12    Plaintiffs' attempt to state a vicarious liability claim against HAL on the basis that it had

13    an actual or ostensible agency relationship with Southeast fares no better.

14    **a.    Actual agency**

15    An agency relationship is created when the agent acts "at the insistence of and, in some

16    material degree, under the direction and control of another." *Barker v. Skagit Speedway, Inc.*, 119

17    Wn. App. 807, 814, 82 P.3d 244 (2003) (internal quotation marks omitted); *see also Koens v. Royal

18    Caribbean Cruises, Ltd.*, 774 F. Supp. 2d 1215, 1222 (S.D. Fla. 2011) (in dismissing an actual

19    agency theory, court noted, "Plaintiff has failed to show that [the cruise line] acknowledged that

20    [the shore excursion company] will act for it, that the shore excursion operator accepted such an

21    undertaking, or that [the cruise line] had any control over the shore excursion operator's actions.").

22    "Both the principal and agent must consent to the relationship." *Stansfield v. Douglas Cnty.*, 107

23    Wn. App. 1, 17, 27 P.3d 205 (2001). And the control required to establish an agency relationship

24    "is not established if the asserted principal retains the right to supervise the asserted agent merely

25    to determine if the agent performs in conformity with the contract. Instead, control establishes

26    agency only if the principal controls the manner of performance." *Uni-Com Northwest, Ltd. v.

27    Argus Pub. Co.*, 47 Wn. App. 787, 797, 737 P.2d 304 (1987) (internal quotation marks omitted).

28    HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
      SECOND AM. COMPLAINT

1    Again, Plaintiffs' conclusory allegations (Dkt. #35 at 29–30 (SAC ¶¶ 95, 96)) that

2 Southeast acted as HAL's agent and that they had an "agency relationship" are not enough to

3 survive a motion to dismiss, particularly where Plaintiffs allege HAL also was the agent of

4 Southeast and Mr. Lanzendorfer, *id*. at 31 (¶ 103), thus magnifying the pro forma nature of their

5 agency allegations. *See Williams*, 851 F.3d at 1025 n.5 (allegation that "Defendants … were the

6 agents or employees of each other and were acting at all times within the course and scope of such

7 agency and employment" "is … a conclusory legal statement"); *Aliign Activation Wear*, 2020 WL

8 5790418, at *4 (allegation that company "has the right to control the conduct of [the Canadian

9 entity] with respect to the matters entrusted to it" is legal conclusion and not entitled to credit).

10    Beyond their contradictory and conclusory allegations, Plaintiffs allege no facts to make

11 the existence of an agency relationship plausible. Plaintiffs never allege that both HAL and

12 Southeast consented to creation of an agency relationship *and* that Southeast acted at HAL's

13 insistence, despite the fact that they are critical features of an agency relationship. The only

14 agreement Plaintiffs allege, albeit in conclusory fashion, is that "Southeast would operate and [sic]

15 shore excursions that were promoted, marketed and directed to the Holland Defendants' cruise

16 passengers on behalf of such joint venture." Dkt. #35 at 29 (SAC ¶ 96(a)). But this allegation not

17 only refers expressly to a joint venture, rather than agency, it is at most consistent with HAL and

18 Southeast undertaking two different forms of work and stops far short of alleging that Southeast

19 operated Plaintiffs' flight *at HAL's insistence*. The same is true for the allegations that HAL

20 provided Southeast with its itinerary and schedule and that HAL was named as an additional

21 insured on its policy. Even assuming the truth of these allegations, they still do not establish that

22 Southeast operated flights *on HAL's behalf*.

23    Plaintiffs' agency allegations are doomed for yet another reason—they never allege facts

24 to establish that HAL controlled the manner of Southeast's performance. Plaintiffs' allegation that

25 HAL "governed the subject of how, when and where the agreement to provide sightseeing

26 floatplane tours to their cruise passengers was to be performed," *id*. at 30 (¶ 96(f)), is just a legal

27 conclusion. *See Aliign Activation Wear*, 2020 WL 5790418, at *4. But Plaintiffs never back this

28 HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

conclusion up with any supporting facts to plausibly allege HAL actually controlled Southeast's performance. For example, Plaintiffs never allege that HAL picked what routes Southeast would fly, determined when flights would operate or be cancelled in response to changing weather conditions, or decided which pilots would operate Southeast's flights. And Plaintiffs' allegations against Southeast and Mr. Lanzendorfer, including the allegations that Mr. Lanzendorfer negligently operated the floatplane and failed to cancel the flight due to adverse weather conditions, supports an inference that HAL did *not* control Southeast, a federally certificated Part 135 operator. *See* Dkt. #35 at 32–34 (SAC ¶ 111(b), (c), ¶ 119(b), (c)).

### b. Ostensible or apparent agency

Finally, Plaintiffs allege no facts at all to establish an ostensible agency or apparent authority relationship existed between HAL and Southeast. Under Washington law, an apparent or ostensible agency exists when the principal "has placed the agent in such position that persons of ordinary prudence, reasonably conversant with business usages and customs, are thereby led to believe and assume that the agent is possessed of certain authority, and to deal with him in reliance upon such assumption." *Lumber Mart Co. v. Buchanan*, 69 Wn.2d 658, 662, 419 P.2d 1002 (1966). "Apparent authority may be inferred only from the acts of the principal, not from the acts of the agent." *Hansen v. Horn Rapids O.R.V. Park of the City of Richland,* 85 Wn. App. 424, 430, 932 P.2d 724 (1997).

Like their other vicarious liability theories, Plaintiffs invoke the phrase "ostensible agency" without alleging facts to plausibly establish any of the elements. *See* Dkt. #35 at 27, 29, 31 (SAC ¶¶ 88, 95, 103). Among other things, Plaintiffs do not allege that HAL made any statements to *them* that they reasonably relied upon and that led them to believe that Southeast had authority to act on HAL's behalf.[4] Nor do they allege that they believed that Southeast was acting on HAL's

---

[4] Plaintiffs' allegation that HAL sent promotional material about Misty Fjords does not assert that it included any communication about Southeast, much less any communication to suggest that Southeast was acting on HAL's behalf. Dkt. #35 at 15 (SAC ¶ 34). In any event, Plaintiffs make this allegation on "information and belief," which is improper where, as here, the facts are not "peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910,

HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
SECOND AM. COMPLAINT

STOKES LAWRENCE, P.S.
1420 FIFTH AVENUE, SUITE 300
SEATTLE, WASHINGTON 98101-2393
(206) 626-6000

1  behalf and, if so, that their belief was "objectively reasonable." Indeed, Plaintiffs' factual

2  allegations squarely foreclose them from pleading an ostensible agency: Plaintiffs admit that they

3  booked their excursions through third-party travel agents, not HAL, and do not allege that HAL

4  ever indicated to them in any way that Southeast acted at its direction and subject to its control.

5  *See id*. at 14–17 (SAC) ¶¶ 33, 39).

6  **V.    CONCLUSION**

7  Because Plaintiffs have failed to state any viable claims against the Holland America

8  Defendants, the Court should dismiss the claims against them for failure to state a claim.

9  DATED this 13th day of October 2022.

10

11  STOKES LAWRENCE, P.S.

12

13

14  By:   */s/Caryn Geraghty Jorgensen*
     Caryn Geraghty Jorgensen (WBSA #27514)
15     Brett MacIntyre (WBSA #46572)
     1420 Fifth Avenue, Suite 300
16     Seattle, WA 98101-2393
     Telephone: (206) 626-6000
17     E-mail:  Caryn.Jorgensen@stokeslaw.com
     E-mail:  Brett.MacIntyre@stokeslaw.com
18

19     Attorneys for Defendants Holland America
     Line, Inc., Holland America Line N.V., and
20     HAL Antillen N.V.

21

22

23

24

25

26

27  928–29 (9th Cir. 2017) (internal quotation marks omitted). Plaintiffs should know what communications they received
     and relied upon as the basis for booking their excursion.

28  HOLLAND AMERICA DEFS.' RULE 12(b)(6) MOT. TO DISMISS
     SECOND AM. COMPLAINT